Morning. May it please the Court. Kevin Ross on behalf of Plaintiff Appellant. There are a lot of different statements in this security fraud case, and I'm happy to answer questions about any of them, but I'd like to start with the penetration and headroom statements and then talk about the risk statements. Beginning the class period, Netflix's CFO, Spencer Newman, represented to investors that the market in the U.S. and Canada was roughly 60% penetrated, and therefore, quote, we've got a lot of headroom to grow. Those statements were false and misleading because that statistic, that 60% figure, accounted only the portion of Netflix households that were paying for the service. I know, but where are the facts alleged in the complaint that established that the hearers of that statement thought that the 60% included people who were sharing? There doesn't seem to be. It seems everyone understood that the 60% is subscribers, and everyone's worried about how much of the remaining 40% cushion is taken up by, you know, password sharers. But where are the pleaded facts that show that the 60% was, oh, well, that takes into account all the sharers, too. Where is that? So several things. Mr. Newman himself, in the last day of the class period, explained that penetration is composed of two groups, people who are paying for accounts and people who are sharing accounts. CEO Hastings said- So which paragraph is that in? That is in paragraph 134. 134? ER 86. In an investor letter sent the same day, Netflix told investors, quote, and this is ER 83, paragraph 130, are relatively high household penetration when including large number of household sharing accounts combined with competition is creating revenue headwinds. CEO Hastings, at paragraph 133, on the same call, said, with all the account sharing, when you add that up together, we're getting pretty high penetration. Where's the 60% statement? What paragraph is that? That's paragraph 134. 134? I'm not seeing the number 60% in paragraph 134. I hope I didn't get that wrong. It's in 147. It's in a couple of places, but- I see it in- You find it. I'm looking at, like, the operative statements. You know, at some point, the complaint shifts to marching through each statement that it says is false. And it's the first one in that in 147. Right, right. But that one is a January 19th, 2021 statement with the 60% penetrated. And the other statement you referenced in 134 is an April 2022 statement that then uses penetration and recognizes, as a practical matter, the broader problem with the two types. But that's not putting the two together. Where's the statement contemporaneous with the 60% penetration that would show a market analyst that they're capturing in that number the password shares? I think the word penetration didn't change between the 60% statement and, you know, a number of months later, four months later, when he said that it's composed of the two groups. That's the best we can do. It is a word. It has a meaning. Nobody thinks it changed over time. He understood it at the end of the class period to include both groups. The CEO understood it to include both groups. Does it matter if that understanding changed? Because it seems like internally to the company, as well as externally, there's a growing recognition of the—I guess there are two things going on, right? There's the extent of password sharing, and then there's a separate question of whether the password sharing is materially detrimental to Netflix. But it seems like with respect to both of those things, there was an evolution with inside the company as to whether it was really an issue. And so penetration might have tracked that. I mean, I guess for me, your first statement is quite a ways back. Then there's the December board meeting where there does seem to be kind of a clear internal connection between those two. And then, you know, you started with the last day of the class period, and probably if that's all you've got, that's probably—that's something, but that's not going to capture most of your complaints. So what are we to make of the time period? I get that penetration is the same word, but doesn't it matter—doesn't the meaning of it matter to the extent it might shift? So if the meaning might shift, it would matter. There's no indication that it did shift. And we have information about how analysts understood it, because when the sharing information came out at the end of the class period, they didn't say, oh, penetration was 60 percent. They were right about that, but my gosh, there's a lot of sharing. Instead, they changed their estimates of the degree of penetration, consistent with Newman's use of that word. What may have changed during the class period was Netflix's assessment of what penetration, what sharing meant for future growth. But investors were entitled to reach their own determinations about that question based on accurate, non-misleading information about current effects or current things happening on the ground. And the amount of penetration was a fact that was true or not true. And whether—what Netflix thought about its implications for future growth just are not—don't go to it. Also, when was the first time that Netflix informed anybody about the password sharing possibly being a problem? I think in the risk statements, they said that abuse of multi-household usage could cause reduction in growth. And, of course, that's the other set of statements that we think were materially false and misleading, because at the time they had made that, that had already happened. Abuse was already ongoing. Their attempts to deal with it had proven ineffective. We also think, although it's not necessary to prove for these to be false, that it had interfered with the growth. They acknowledged that at the end of the class period. They were explaining why the past four quarters had had anemic growth, and they were saying it was because, in part, of sharing. Well, in part. I mean, I guess that's—it seems like there's also, in the pleadings and in the story, again, it's not clear whether it's an unalloyed evil in terms of the sharing, right? There's also recognitions there that, no, it's a way to—you've got kids who are growing up and using it. And so it makes it a little more complicated. And, of course, that word abuse has to do a lot of work here. Is the 20 percent there—I mean, is there anything in the complaint that allocates that 20 percent of sharing into abuse, things that are materially bad for Netflix, versus something that could be a virtuous cycle in terms of growing customer base? Well, I think there's two questions. And, again, I think you are pointing to a set of issues about what would the level of penetration being experienced, the level of sharing being experienced, augur for future growth. That is very different from the question of whether or not password sharing was, in fact, being abusive at the time. And I think— Right, so one is kind of about the penetration representation, and the other goes more to the risk disclosures and liability for that. Well, I think—I'm trying to distinguish between representations about what's happening right now, what's happening on the ground. And then there's a set of judgments one makes about what does that augur for the future. Is that a bad thing for future growth, or is it a good thing? And we are not alleging that they were fraudulent about what it augured for the future. We are just saying that investors had a right to non-misleading information about what was happening on the ground at the time, so they can make their own assessment. So one of the issues that comes up in the briefing is to what extent, in order to establish the falsity of the statements you've enumerated, you have to show their internal knowledge of the scope of the problem. And you try and say that that's a scienter issue, but doesn't it, to some degree, go to falsity? Because some of this, particularly like the did abuse occur, that would be false if they knew that the problem was there. Am I wrong? I mean, help me out on that issue. I don't think that's right. So let's start with the penetration statistic, and let me use a slightly different example. If they had lost 100,000 subscribers in the past quarter, and they said we only lost 50,000, they couldn't turn around and say that was a truthful statement because we hadn't yet decided that we couldn't get them back. And that's essentially what they're saying here. If penetration means what Newman said it meant, that statement was simply false. Penetration was 80 percent, not 60 percent. And that doesn't change, that doesn't become true, simply because they hadn't yet reached a conclusion about what that level of penetration meant for the company's future. The same thing about the level of return. The same thing with the risk statements. The falsity of the risk statements turned on whether there was abusive level of sharing, whether their attempts to stop sharing had proven ineffective. I don't think there's any dispute that that had already occurred. And whether or not it had been eating into their growth. And I think, again, at the end of the class period, they acknowledged that it had been eating into their growth. They were blaming, in part, the poor performance over the past few quarters on sharing. Can we make anything of the disclosure? You started with kind of the last day of the class period, and then the disclosure comes out, price drops. Can we make anything out of that? There are cases that suggest we'd want to look in terms of understanding the reasonable investor's reaction to that. There we have a lot of reasonable investor's reaction to that. But does that take you anywhere with respect to the falsity of it in terms of what the word penetration meant? Yeah, I just, again, it's not so much the reaction. It's that the statements they made at that point used the word penetration in a way that included all households being served. And, again, we just respectfully submit that a reasonable jury could at least conclude that the meaning of that word did not change. At the very beginning of this case, the question before this court is not who has the better argument, who has the better set of inferences about the word meant, but whether a reasonable jury could conclude that our version of the events is the correct one. If there are no further questions, I'd like to reserve the remainder of my time. All right. Thank you, counsel. All right. We'll hear next from Mr. Rowley. May it please the court, Fred Rowley, Jr., for the Netflix defendants. I'd like to start out picking up on a question that Judge Johnstone asked about the end of the class period statements because I do think that it highlights what I think we have here, which is what Judge Friendly would have called a pleading by hindsight theory. They have simply taken the bad news that was disclosed on April 19th, 2022, and sort of worked backward and assumed that Netflix and its executives must have known the impact of account sharing throughout the entire class period. But as the district court recognized, what's missing is facts showing that outwardly Netflix was making statements about account sharing that misled investors, while internally Netflix had drawn conclusions about the impact of account sharing. But your opposing counsel says that, you know, whether or not you subjectively drew the conclusion about how much runway was left is not really relevant to the falsity issue of whether or not the runway is short. I don't think that's right, Your Honor. And I think if you go right to the plaintiff's allegations and the critical allegations that explain why the statements are false, because, of course, under the PSLRA, they have to identify the statements that are false and then they have to explain why they're false. And I would point to two recurring allegations in the complaint. So the way the complaint is structured, they set out the statement that's purportedly false, and then they explain why each of the statements is false. And you'll see that there are two recurring allegations. The first is Netflix's ability to acquire new paying members was severely hindered. That allegation shows up at paragraph 22, and then it's carried forward in explaining why the challenge statements are false in paragraphs 148, 150, 152, and so on. Why doesn't that go to materiality more than falsity? If you look at the actual allegation, it says that the statements are false and misleading for the following reasons, and the punch line is the allegation I just read. So they're talking about their falsity theory. It may also go to materiality, but these are the reasons why they say they're false. The other allegation is similar. It's as follows. The principal reason for the slowdown in Netflix's membership growth was the degree of market saturation due to account sharing. Again, they are talking about impact. What I just read you can find at paragraph 150. It's carried forward again in paragraph 154, 156, and 159, and so on. Well, what are we – I guess I'll tell you the internal statement that troubles me in this respect is the December board meeting where it does seem that Netflix's executives, the allegation is, is that they're using penetration in exactly the way that the plaintiffs take it to mean. I don't think that's right, Your Honor. So the district court concluded that plaintiffs' new allegations in the SAC, and the court is referring there to the December 1st, 2021 board meetings. The court reasons that the new allegations in the SAC at most suggest that Netflix took efforts to investigate and quantify account sharing and identified account sharing as one potential threat to growth among many, and I think that's right if you look at the board minutes. But I guess – so how much do plaintiffs have to plead here? If – as I understand the theory, I get that you've pointed to allegations that suggest that they've kind of bound up with materiality, but isn't it for the public to decide whether 60 or 80 percent penetration defined to include sharing is good or bad for Netflix? Your Honor, I think the plaintiffs' theory – and it's not just in their allegations. I think if you look at even the reply brief, right, their theory ultimately redounds to impact. That is the sense in which and the reasons why these challenge statements are purportedly false. Well, given the delta between the final disclosure and what happened to the price, I'm not sure you did – I'm not sure you went on that ground either at the pleading stage. So, again, I'd go back to their reply brief, right, because I do think even in their reply brief at page 16, the way that they articulate why this is false shows that this is really an omissions case, right? They're saying that Netflix first knew about, and they haven't pled facts. We should get back to the December board meeting. But they haven't pled facts establishing that Netflix knew, and I'll touch on Judge Collins' question here, not knew in the sense of knowledge, but there was a fact, and the fact was the impact of account sharing. That fact was known internally. They are saying the opposite externally. And so I don't think you have allegations that establish that. And I think if you go just to your question, Judge Johnstone, about how – about what their theory of falsity is here, look at page 16 of their opening brief, right, where they say defendants claim that Netflix had ample room for growth in the UCAN, United States and Canada, because it had only penetrated approximately 60 percent of the available market. We're misleading because they omitted that half or more of the remaining supposedly unpenetrated market had little reason to subscribe because they're already receiving Netflix. So the point, again, is impact. They can't run away from it. It's in the complaint. It's their theory. But if you say that there's a big, long runway of growth, and that was said in April of 2021 and then again in January of 22, their point – and they use a kind of homely analogy that there's 40 percent left on the runway, but 20 percent is all potholes and debris all over it. You can't really describe that as a big, long runway of growth if you know that there's a big problem with half the remainder or more. But that depends on a couple of things. The district court reason, the court does not find that defendant's statements imply that the remaining portion of the UCAN market was readily available for capture, and they're trying to use this big, long runway statement, which by the way is puffery, but they're trying to marry it. So it's puffery, but at some level there is an underlying fact in there that we've got ample room for growth. And the fact that half of what's left is hindered by this problem of we need to convert these people from freeloaders to subscribers is a logistical hurdle that the market clearly wanted to know. You were being asked about this in calls. But the question, Judge Collins, is whether Netflix or its executives said anything to mislead investors or a reasonable investor about that very point, and I think the district court was right to say that a reasonable investor wouldn't have read the 60 – But big, long runway suggests that all the rest of it is available. It's not impeded by this big problem. Judge Collins, they tried to marry that statement with the 60 percent market penetration statement, but I think the district court was right when it reasoned that no reasonable investor would have understood that statement in context. Even granting that because their own analogy on the 60 percent, their apartment house analogy on the 60 percent I actually think counts in some ways against them because if you say I've rented out 60 percent of the building and everyone would know that that means just renters, but then you know that 20 percent are squatters and you don't reveal the 20 percent are squatters and you say we've got ample growth for the rest and long runway for the rest. It's not so long if they're taken up by squatters. Judge Collins, I think that that analogy sort of falls apart. It doesn't really work in the online context since the advent of the Internet. Online platforms have grown their subscriber base, grown their platforms by giving stuff away. And so I just think that the real estate and the squatter analogy doesn't really fit. And part of the reason why the squatters would be a problem is because they cast a pall on whoever wants to rent a room and whether the rooms are going to be pleasant to live in. I don't think it fits, but I want to get back to Judge Johnstone. Is there anything in the complaint or anywhere in the record that pleads or says anything about the ability to convert people from being freeloaders to subscribers? It doesn't. And that was the linchpin of the deficiency in the initial complaint. The district court identified that as part of the reason why they hadn't pled falsity. And they didn't plead facts to fill that gap in the second amended complaint. And that's why the district court concluded that the plaintiff's allegations do not plead with the requisite particularity, among other things, that defendants had concluded that efforts to curb account sharing would fail. So it is part and parcel of the… It might be that they really – they got used to Netflix. They really like it. And now that they've got a pony up, maybe they'll do it. Well, I think history has shown, you know, and the court can't consider it, but, of course, they were willing to do it. But back to Judge Johnson's question about the December 1st board materials because I think it's important. I think the district court read them right. There is a statement that the plaintiff… Well, and that's exactly my – I mean just to get ahead of you a little bit. That's exactly my concern. So the district court says the court does not find, which wouldn't quite be the right word at the pleading stage, the representations about market penetration to be false or misleading because these statements clearly referred to paid subscribers. How can a district court do that at – make that determination at the pleading stage? So a couple of things. One, first with respect to the board materials, which goes to really the second aspect of falsity that the plaintiffs have to plead, right, which is what did Netflix know versus what did Netflix outwardly say? And if you look at the board materials, the district court noted the cited board materials discussed the 59 percent broadband household penetration metric for UCAN suggesting Netflix considered the 60 percent figure to represent the relevant saturation measurement. And so the board materials are consistent with the idea that even internally, Netflix thought that the 60 percent paid net ads measurement figure was the relevant metric. And you can see that… Why is mere consistency enough at the pleading stage? Sure. If a jury could find it the other way – we're talking here about a statement. It's pleaded with particularity. Why doesn't that get them past pleading? It has to do with the daylight between what the fact is that was known internally allegedly and then what they are saying outwardly. Now, let's talk about what they say outwardly because the district court rejected their interpretation of the market penetration statement as well. So the district court found or concluded that the allegations were deficient as to both aspects of this falsity theory. With respect to the challenge statements, the district court rightly noted that the context for this statement, both of them, made clear that these statements are talking about 60 percent market penetration referred to paid ads. So with respect to the January 19th, 2021 statement by Newman, which was roughly 60 percent penetrated, that statement, it's immediately preceded in the sentence before by a sentence discussing growth in paid net ads. What about the March – so I find the March 2022 conference with Morgan Stanley, that comes after this board meeting. How would you frame that in terms of the context? Again, 60 percent penetrated today in the U.S. Similar context. It's preceded by Newman's discussion of growth in the UCAN market and, again, paid net ads. Newman makes a statement about the growth in the UCAN market using paid net ads. That prompts the analyst to then ask a question about the UCAN market, and that's when Newman uses this statement. So, again, the context is quite clear that he is talking about paid subscribers. Judge Johnson, if there were any doubt about that, Newman takes that 60 percent market penetration statement in the next sentence and applies it to the worldwide connected TV market and comes up with a figure of half a billion members, right? That's in the next sentence, members, paid subscribers. So I think the district court was spot on in concluding that this statement really can't be read and can't bear the load that the plaintiffs are placing on it. And, again, I would go back to the allegations in their complaint and what they end up just falling back to, and they can't help but fall back to even in their reply brief, which is this is an omissions case. And this gets to Judge DiAlba's question about when Netflix talked about account sharing as potentially a problem, also potentially something that could promote growth. Most of the challenge statements on their face really aren't about account sharing. The one exception is the disclosures, of course, and the district court was right to conclude that those disclosures are not false and misleading. They actually acknowledge that account sharing is happening and just notes that it could cut. But it says if it's abused. So at some point, you know, the disclosure acknowledges that if it reaches a certain level, it's it's a problem. But they contend that you knew that it had reached that level. Judge Collins, they haven't pled the fact that they say Netflix and its executives misled investors about, which was the impact that that Netflix knew the impact of account sharing during the class period. Of course, they disclosed at the end of it in the last statements that. And that goes right to the omissions. Right. I mean, so the difference between a affirmative state and an omissions case is just that the omission is material. But they haven't pled facts showing that Netflix had come to ground on that issue during the class period. Netflix did offer an explanation at the end of the class period, which is that COVID had created uncertainty and made it hard to assess not just that factor, but a variety of other factors as well. Judge D'Alba, this was something that that Netflix and investors talked about openly for many years. My friend suggested that these disclosures were really the first time that Netflix acknowledged that account sharing could tack the other way. But the allegations of the complaint show that that's not right. I think Wells noted as early as 2016 that that account sharing wasn't a problem. Then he says, quote, We don't feel like it is a material inhibitor to our growth. That might not be true forever. So as early as 2016, there's this acknowledgment that the factor could have an impact that's positive or negative, turning in part on whether Netflix is able to convert sharers into subscribers. That's not a fact that the plaintiff has pled with the requisite particularity. And we haven't even gotten to Scienter because that is a threshold that's even higher. And I think the allegations fall well short of establishing that. And we cite cases that show that even if a company just got it wrong, but the executives thought that they would be able to solve this problem, that's insufficient for Scienter. So I think no matter how you cut it, despite being given a couple of opportunities to plead a legally sufficient securities class action complaint, the plaintiffs just fail to do that here. All right. Thank you, counsel. We'll hear rebuttal now. Thank you. Just a few points, one about penetration, one about their foundational premise, and one about the difficulty of converting shareholders into subscribers. We have two theories about the penetration and household statements or headroom statements. We spent the beginning of my argument talking about the first, which was that the penetration statement is simply false. As we've discussed during this time, I think both sides point to different bits of context that might support a view that reasonable investors would take one view versus another. That's precisely the kind of situation in which dismissal is inappropriate and has to proceed to allow a jury to figure out who's right about that. But we also have the theory that even if everybody understood penetration means only paid subscriber, it was still misleading. It was still an omission not to disclose that half of the remaining market had no need to purchase the surface because they were getting it for free through password sharing. That is very much, I think, the kind of case. But for that, I mean, I can see the 60 percent penetration as being that sort of objectively true or false, depending on what you've pled about what penetration means and what a hearer would have thought. But then when you get to the omission, whether a half-truth or omission side of the case where you didn't disclose that fact or you're making statements about runway, why isn't their internal knowledge relevant to the falsity of those statements? If they say, we think there's a lot of runway left, that's the statement that's alleged, why isn't their internal knowledge about the scope of the problem and its impact relevant to whether that statement is true or false? It's not objective in the same way as the 60 percent is. Well, there is maybe some element of opinion if you're using those characterizations along runway. But let me focus first on penetration again. I think even if everybody understood what penetration meant, it is misleading to not say that. Can you point me to another statement you've alleged is false in the complaint other than the 60 percent penetration comments, the two of those, that has the same sort of objective true falsity where it's completely independent of their internal knowledge? I do think that the long runway for growth is a statement. As you just said, Bill, you just admitted the long runway for growth has an opinion aspect to it. It has an opinion aspect. So you don't have any other one that's just kind of a pure fact like the 60 percent? I was going to say we have some statements about churn. I don't want to focus on those right now. But I do agree that the long runway for growth has an aspect of opinion about it. But opinions can be false and misleading when the facts don't align, the facts in their possession don't align with that assessment. Do you need the runway statements to – can you rely simply on the penetration statements? We can. We could go forward with that part of the case. I would say – Well, why? I mean, so this goes back again to how much is the penetration statements – how much does that depend on the connotation that there is runway? I think the truth or falsity doesn't depend on it at all. They have a scienter argument that this court didn't reach. There's no reason for this court to reach it in the first instance. They can go back and they can try to prove that they somehow thought that the word meant something different than Newman said it meant at the end of the class period. But that – the scienter issue, which – I mean we'd have the discretion agreement, but the standard of review, if it goes back to the district court and comes back up, would be de novo. That's right. But I do think that you would – Equally the care and adequacy of the complaint for scienter. You could – I do think that the reason you don't address questions like this that weren't addressed below is you do benefit from the views of the court that has a lot of experience with this fact-bound, fact-intensive question. If I could say one more thing about this question about how – whether it matters or how hard it would be to convert sharers into subscribers. It's clearly a materially different market when you have half the remaining market in that situation. CEO Sarandos himself at ER87 paragraph 136 said that it is harder to get people who already have the account to subscribe. What paragraph was that? That's paragraph 136. I'd also refer you to paragraph 248 where Netflix internally was discussing the problem with trying to convert these folks over is that the measures that you would take to stop sharing could alienate customers. It is a materially different kind of market when – to deal with, to squeeze growth out of when you've got to deal with those kinds of problems. And omitting the fact that you're having to deal with that kind of market I think is materially misleading. And I think it is. I would point you finally to Burson, which I think is very similar to this case where they did not disclose the true content of the backlog that they bandaid about in that case. All right. Thank you, counsel. All right. The case just argued to be submitted. We thank the counsel on both sides for their helpful arguments in this case. And the case just argued is submitted. And with that, we are adjourned for the day.
judges: COLLINS, JOHNSTONE, ALBA